# United States Court of Appeals for the Federal Circuit

_____

**DILLON TRUST COMPANY LLC, AS TRUSTEE FOR TRUSTS 709204, 709210, AND 8545,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2024-1314

_____

Appeal from the United States Court of Federal Claims in Nos. 1:17-cv-01898-EGB, 1:17-cv-02022-EGB, 1:17-cv-02023-EGB, Senior Judge Eric G. Bruggink.

_____

Decided:  May 14, 2026

_____

LAWRENCE M. HILL, Steptoe LLP, New York, NY, argued for plaintiff-appellant.  Also represented by CAITLIN REBECCA THARP, Washington, DC.

GEOFFREY KLIMAS, Tax Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by JACOB EARL CHRISTENSEN, DAVID A. HUBBERT.

_____

Before LOURIE, STOLL, and STARK, *Circuit Judges*.

PER CURIAM.

The Dillon Trust Company LLC, on behalf of a group of trusts for the Dillon family, appeals the decision of the Court of Federal Claims holding the Dillon trusts liable as transferees for the unpaid taxes, penalties, and interest of Humboldt Shelby Holding Corporation. The Dillon Trust Company also appeals the Court of Federal Claims' summary judgment denying the Dillon Trust Company's illegal exaction claim as a matter of law. For the reasons discussed below, we affirm the Court of Federal Claims' decisions.

## BACKGROUND

The following facts are taken from the Court of Federal Claims' post-trial and summary judgment orders and are unchallenged on appeal.

## I

In the 1930s, the Dillons created numerous trusts for the benefit of their descendants. By 2000, the assets held by these trusts had appreciated in value to approximately $90 million. The trusts owned stock in two C corporations—Humboldt Corporation and Shelby Corporation. These corporations, in turn, owned assets consisting almost entirely of blue-chip stocks and prime farmland. Humboldt owned the Dunwalke Farm in New Jersey, on which cattle were raised, whereas Shelby owned farmland in Illinois and Iowa, which supported production of corn and soybeans. The investment portfolios the corporations owned were meant to help fund these farming operations. But the Dillon family faced several concerns regarding Humboldt: (1) the cost of running Dunwalke Farm was greater than the income it generated; and (2) there was uncertainty over what would happen to the property located at the center of Dunwalke Farm, which had been donated to Princeton University to use for educational purposes, with the gift transferring ownership of the property to the university in 2001.

The Dillon family was not only the beneficiaries of the trusts that owned Humboldt and Shelby, but some family members were directors of Humboldt and Shelby and some were trustees of the trusts that owned Humboldt and Shelby (alongside other corporate trustees). The Dillon Trust Company was eventually formed to serve as a corporate trustee for all of the Dillon trusts.[1] At the relevant time, Keswick Management, Inc. provided accounting, investment, and advisory services to both the Dillon trusts and individual Dillon family members.[2] The Dillon family also used the international law firm Shearman & Sterling.[3]

At some point between May and December of 2000, while the Dillon family was evaluating their use of Dunwalke Farm, they received an unsolicited offer for the property. Given the concerns that the family had, they decided

---

[1] Two Dillon family members, Mark Collins and Chris Allen, testified before the Court of Federal Claims as representatives of the family. Mr. Collins has served as the chairman of the Dillon Trust Company, a co-trustee of multiple Dillon trusts, and a director of both Humboldt and Shelby. He has an MBA and worked as a partner at an investment advisory firm. Mr. Allen has served as a director of Humboldt, has a JD, and worked as a mergers and acquisitions advisor.

[2] Three members of Keswick testified before the Court of Federal Claims: Crosby Smith, the Chairman of Keswick; James Ruddy, the President; and Donald Barclay, the Vice President. Mr. Smith and Mr. Ruddy also served as co-trustees of several Dillon trusts and as officers and directors at Humboldt and Shelby.

[3] Laurence Bambino was a partner in Shearman & Sterling's tax department who was the tax attorney for the Dillon family, and Peter Rooney was a mergers and acquisitions partner at Shearman & Sterling who oversaw the auction of Humboldt and Shelby. Both testified before the Court of Federal Claims.

to sell Dunwalke Farm.  Mr. Bambino emailed other Shearman & Sterling attorneys on April 5, 2001, stating:

> [Mr. Ruddy] called yesterday and told me that the Dillon family met on Wednesday and has decided to try to sell a substantial portion of the farmland to the Goldman Sachs executive[, John Thornton,] and a smaller portion to D. Eweson[, a member of the Dillon family]. . . .  I'll send you each a copy of the tax memorandum [Mr. Ruddy] asked me to prepare, which will include various approaches for disposing of Humboldt and its assets.

*Dillon Tr. Co. LLC v. United States*, 168 Fed. Cl. 228, 236 (2023) ("*Post-Trial Order*") (omission in original) (citation omitted).

An April 17, 2001 draft of that memorandum stated:  "You have requested our advice with regards to the disposition of Humboldt Corporation ('Humboldt') and its assets.  This memorandum discusses alternative strategies for doing so and the US federal income tax consequences of each."  *Id.* (citation omitted).  The draft memorandum presented two principal strategies:  "Subsequent to the sale of the farmland, the shareholders may either liquidate the corporation by selling its portfolio and distributing the proceeds, or they may sell their shares in Humboldt to unrelated investors."  *Id.* (citation omitted).  Thus, the first option suggested an asset sale and the second a stock sale.  Mr. Bambino explained that the "biggest distinction" in the two strategies was the tax consequences—a fact he expected the Dillon family to be generally aware of.  *Id.* at 236 & n.8 (citation omitted).  An asset sale would trigger two levels of tax for built-in gains—i.e., at both the corporate and the shareholder level; a stock sale triggered only one level of tax for built-in gains—i.e., only at the shareholder level.  A stock sale does not trigger corporate-level taxes on built-in gains because that liability is essentially passed on to the buyer.  The buyer of a corporation acquires its underlying assets with the built-in gains intact, so that gains

are realized and taxes triggered only when the buyer subsequently sells the assets. The purchase price of such a corporation might be discounted to account for the tax liability on unrealized gains.

This was particularly relevant to the Dillon family, as Humboldt and Shelby had relatively low bases in the corporations' assets: they had an approximate basis of $16 million, with over $71 million in unrealized gains. Thus, disposing of the corporations' assets and distributing the proceeds to the Dillon trusts would mean paying a substantial tax at the corporate level when the assets were sold, and then again at the individual level when the corporations were dissolved and the assets distributed. This dual layer of taxation meant that the net proceeds for the Dillon trusts could be reduced by almost half. Naturally, then, the Dillon family preferred a stock sale to an asset transfer.

However, what a buyer does after a stock sale with the corporation's assets could become problematic. In a draft memorandum dated April 19, 2001, Mr. Bambino explained: "This [stock sale] poses a problem, however, if the investor then sells the Humboldt assets to a third party, because the transaction may be characterized as a tax shelter by the [Internal Revenue Service (IRS)]." *Id.* at 237 (first alteration in original) (citation omitted). Several people involved with the Dillon trusts—including Mr. Allen and Mr. Ruddy, who were "tax guys," as well as Mr. Collins—would have been aware of these potential problems. *Id.*

While the evaluation of the Dillon family's tax strategy was ongoing, Humboldt signed a contract in July 2001 to sell part of Dunwalke Farm. The contract contained provisions in which the buyer proposed purchasing the gifted property from Princeton, and the seller proposed selling the remaining part of the property to Dorothy Eweson. On August 9, 2001, Mr. Bambino sent the Dillon family a follow-up memorandum about how Humboldt might be

6                                DILLON TRUST COMPANY LLC v. US

disposed of after the farmland was sold.  In the memoran-
dum, Mr. Bambino noted that Humboldt had signed a con-
tract of sale and that, if retained in the present form,
Humboldt would be subject to both federal corporate in-
come tax at a rate of 35 percent and a personal holding
company tax of about 40 percent on its interest and divi-
dend income.  Mr. Bambino calculated the net proceeds of
four hypothetical transactions:  one involving a liquidating
distribution after all assets were sold and three involving
a stock sale of Humboldt.  As part of this assessment,
Mr. Bambino assumed that Humboldt stock would be sold
at 93 percent of the fair market value of the underlying as-
sets—i.e., with very little discount for the embedded tax li-
ability.  Using that assumption, his calculations showed
that the net proceeds to shareholders were $20 million
more with a stock sale compared to an asset sale.  Similar
to the memorandum drafted in April, however, Mr. Bam-
bino warned of IRS scrutiny into tax shelters:  "As we dis-
cussed, there are certain tax risks that need to be explored
and addressed when deciding to pursue [the options involv-
ing a stock sale of Humboldt].  *These include special IRS
rules and penalties for certain intermediary tax shelter
transactions*, failed installment sales and de facto liquida-
tion treatment for Humboldt."  *Id.* (alteration in original)
(citation omitted).

In December 2001, approximately one month before
closing on the first partial land sale of Dunwalke Farm,
that contract was amended so that Humboldt would receive
a promissory note (the "Thornton Note"), instead of cash.
This amendment was a tax deferral strategy.  If the farm-
land was paid for by an installment note, capital gains
would only be realized and reported when the principal was
repaid.  And, under the terms of the Thornton Note, Hum-
boldt would not be paid the principal until January 2005.
Indeed, the contract specifically forbade prepayment of the
Thornton Note, so that taxes would not be triggered before
2005.  When Humboldt later sold the remaining part of
Dunwalke Farm in August 2002, the sale was again

DILLON TRUST COMPANY LLC v. US                                7

structured as an installment sale and the land purchased with a note (the "Dunwalke Note"). Payment of the Dunwalke Note was due in August 2005 and, like the Thornton Note, it could not be prepaid before its date of maturity.

On January 11, 2002, Mr. Bambino sent a memorandum to the Dillon family about alternative strategies for transferring the shares of Shelby that Humboldt owned before a potential stock sale of Humboldt.[4] Unless the Shelby shares Humboldt owned were sold or distributed to the Dillon trusts before the stock sale of Humboldt, a buyer of Humboldt would own the majority of Shelby. In the memorandum, Mr. Bambino summarized the applicable tax rules, including IRS scrutiny regarding intermediary tax shelters: "The IRS has cautioned taxpayers against participating in certain conduit or intermediary tax shelter transactions where a party with losses acquired assets with built-in gain for resale. See IRS Notice 2001-16." *Id.* at 238 (citation omitted).

On February 15, 2002, Mr. Bambino sent a memorandum to Mr. Smith and Mr. Ruddy regarding a "new alternative we discussed last week." *Id.* (citation omitted). Because some of the Dillon family wanted to keep Shelby's farms, the alternative proposed that Shelby would first sell its farmland on installment to those family members, and then, "when Humboldt is sold, the Dillon family trusts . . . would sell their Shelby stock to the unrelated investor that is also purchasing Humboldt." *Id.* (omission in original) (citation omitted). In other words, the purchaser of Humboldt would also buy the Shelby stock not already owned by Humboldt, so that the purchaser would own 100 percent of both Humboldt and Shelby. This alternative was presented to the Dillon family as the most cost-effective option

---

[4]    Humboldt was owned by nine Dillon trusts. Shelby was owned by Humboldt and two Dillon trusts that also owned Humboldt.

8                                    DILLON TRUST COMPANY LLC v. US

in a March 2002 memorandum. The memorandum included calculations of sales proceeds that assumed that the buyer of Humboldt and Shelby stocks would offer a price equal to 95 percent of the value of the corporations' assets.

The Dillon family did not immediately choose this strategy. Mr. Bambino met with accounting firms at the request of the Dillon family in the spring of 2002 and those firms suggested other alternatives. However, Mr. Bambino was concerned about these strategies and sent presentation slides to the Dillon family that included IRS warnings about the alternatives. The slides also included an asset sale and a stock sale as a comparison. The asset sale was projected to yield $48 million of net after-tax-return to the shareholders. The stock sale at 90 percent fair market value to a net operating loss (NOL) investor was projected to yield $69 million of net after-tax-return to shareholders. An NOL investor meant "someone who had tax attributes," as in "tax attributes that reduce tax on gain," potentially including "net operating losses," "U.S. tax credits," or "foreign tax credits." *Id.* (citation omitted). In short, Mr. Bambino recognized that the value of Humboldt and Shelby would be different for a buyer with NOLs versus a buyer without NOLs. For the buyer with sufficient NOLs, Humboldt and Shelby's underlying assets effectively had no associated tax liabilities: losses would offset the gains and any taxes would be reduced or even eliminated.

Ultimately, the Dillon family chose to sell Humboldt and Shelby through a stock sale after becoming liquid. Thus, on September 19, 2002, Shelby sold its remaining farmland for a note with the principal due in September 2005 (the "Shelby Note"). As a result, both Humboldt and Shelby were left with only cash, investment portfolios, notes from the sale of farmland that could not be prepaid, and shares of each other's stock. At this point, Humboldt and Shelby's assets had a fair market value of around $93.7 million, with a cost basis of around $17.4 million.

The corporations' underlying assets therefore had unrealized gains of around $76.3 million that would be taxed when they were sold.

On September 26, 2002, Mr. Smith emailed Mr. Bambino to ask for Shearman & Sterling's help in running an auction for the sale of Humboldt and Shelby stock. Because of securities regulations, a stock sale for Humboldt and Shelby could not be publicly advertised and was therefore limited, with an offering memorandum sent only to select potential bidders. The Dillon family, however, decided not to hire an investment bank to run the auction. An investment bank would have been tasked with identifying bidders and soliciting their bids but would have added to the cost of the sale for the Dillon family. Instead, they trusted Shearman & Sterling to handle the auction.

The Dillon family also considered the timing of the auction—before the end of 2002—to be an important consideration. Mr. Collins explained that, "after the dot-com bubble burst," he believed there were "very large companies that had net operating losses and that could ultimately be purchasers of [Humboldt and Shelby]." *Id.* at 240 (alteration in original) (citation omitted). Mr. Rooney likewise recalled that there "were a lot of economic problems" in 2002 because of the "dot-com bust" and the "stock market [going] down enormously." *Id.* (alteration in original) (citation omitted). Mr. Rooney further recalled that such events also led to a poor liquidity market in 2002—i.e., "all the investors pull back and they don't want to buy anything, so you can't sell anything . . . ." *Id.* (citation omitted).

By October 21, 2002, the list of potential bidders for the stock sale included five entities: Merrill Lynch, Deutsche Bank, CitiSSB, K&Z Partners, and TranStar Capital. Of that list, Mr. Bambino had identified the first three, who were entities he had worked with before, although he "did not actively go out and seek bidders." *Id.* (citation omitted). The final two entities, K&Z and TranStar, were firms that

Mr. Ruddy had identified, although he only recalled conversations with those firms about hedging the investment portfolios owned by Humboldt and Shelby, and not about a stock sale.

Mr. Bambino, however, left room for that list to grow. On October 21, 2002, he sent an email stating that "Chris Allen called me last week and said that he and BDO [Seidman] have identified 2 other potential bidders." *Id.* (alteration in original) (citation omitted). Around the time of the transaction, however, BDO Seidman was receiving adverse publicity over its involvement in tax shelter transactions, and Mr. Bambino ran a Lexis search that revealed that BDO Seidman was under investigation by the IRS for involvement in tax shelter promotions involving intermediate or "midco" entities.[5]    Mr. Bambino also found and

---

[5]    A "midco transaction" or intermediary transaction is structured to allow a seller to engage in a stock sale and a buyer to engage in an asset purchase. Shareholders sell their C corporation stock to an intermediary (or midco) at a purchase price that does not discount for the built-in gain tax liability, as a stock sale to the ultimate purchaser would. The midco then sells the assets of the C corporation to the buyer, who gets a purchase price basis in the assets. The midco's willingness to allow both buyer and seller to avoid the tax consequences inherent in holding appreciated assets in a C corporation is based on supposed tax attributes, like losses, that allow it to absorb the built-in gain tax liability. But, if these tax attributes of the midco prove to be artificial, then the tax liability created by the built-in gains on the sold assets still needs to be paid. In many instances, the midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets. It is thus likely to be judgment-proof, and the IRS will need to seek payment from the other parties involved in the transaction to satisfy any unpaid tax liability.

shared with Mr. Smith newspaper articles related to a federal district court order that required BDO Seidman to disclose tax shelter-related documents to the IRS. Within a week of receiving the information from Mr. Bambino, Mr. Smith sent the Dillon family a copy of the offering memorandum that was given to potential bidders. Mr. Smith did not name any potential bidders or refer to BDO Seidman, writing that "we are trying to be careful about whom we invite to bid as we do not want to include any entity which has a reputation for aggressive tax shelter promotion." *Id.* at 241 (citation omitted). On November 1, 2002, Mr. Bambino informed Mr. Smith and Mr. Ruddy that Humboldt should not pursue potential bidders through BDO Seidman because "[b]ased on those articles, that was not somebody we should work with." *Id.* (alteration in original) (citation omitted). The list of potential bidders was thus effectively capped at five.

Of the five potential bidders that were identified, three submitted offers. K&Z made the first offer; however, the actual bidder was not K&Z. Instead, it was an entity called Diversified Group Incorporated (DGI). K&Z wrote a cover letter introducing DGI and attached a bid letter signed by James Haber, the President of DGI. DGI offered 95 percent of the net asset value of Humboldt and Shelby without discounting the offer for any embedded tax liability. Mr. Bambino was surprised about DGI's bid because he had expected the bid to come from K&Z. Mr. Bambino had Greg Schultz, a legal assistant at Shearman & Sterling, run a search for DGI. Schultz billed less than an hour for "[r]esearch[ing] Diversified Group tax controversy disclosure per L. Bambino." *Id.* (citation omitted). Mr. Bambino did not recall Mr. Schultz's search finding anything on DGI. After DGI submitted its bid, Deutsche Bank submitted a second bid, offering around 86 percent of the net asset value of Humboldt and Shelby. TranStar then submitted a third and final bid, offering a price around 95 percent of the net asset value of Humboldt and Shelby.

Of the three bids received, the Dillon family decided to invite only DGI and TranStar to offer their best and final bids, while requiring payment in cash and the sources of the bidders financing to be identified. When Gregg Grauer from Deutsche Bank heard from Shearman & Sterling that Deutsche Bank was being excluded from the final round of bids, he emailed Mr. Bambino: "[T]he sellers are going to go with the 'highest bidder' . . . . We believe that this approach is a bit simplistic and that it ignores the benefits . . . [of] Deutsche Bank's role as a buyer purchasing with its own cash as compared against a boutique buyer . . . funded with principally borrowed cash." *Id.* at 242 (first omission in original) (citation omitted). DGI was not an entity either the Dillon family or anyone at Keswick had heard of prior to receiving the bid. And neither Keswick nor the Dillon family conducted research into DGI themselves. Mr. Bambino did not conduct any further investigation into DGI based on Mr. Grauer's claims. And Mr. Bambino did not inquire further from DGI about its plans for Humboldt and Shelby or its financing because "[w]e were told . . . that they had proprietary plans, which isn't unusual, because lots of people have proprietary transactions." *Id.* (citation omitted). Nor at any point did anyone in the Dillon family or anyone involved with the Dillon family try to target companies based on their holding of NOLs or any other tax attributes that might justify the assumption of tax liabilities.

On November 26, 2002, Mr. Rooney and David Kershaw, an associate at Shearman & Sterling, sent Keswick a memorandum summarizing DGI's and TranStar's final bids. DGI offered $92.2 million in cash while assuming the underlying assets' value to be $97.0 million—i.e., approximately 95 percent of total value. It disclosed Rabobank as the funding source. TranStar offered $86.6 million in cash while assuming the underlying assets' value to be $91.1 million—i.e., approximately 95.14 percent of total value. DGI was selected as the winning bid solely based on its higher offer.

On November 27, 2002, Mr. Kershaw emailed a Stock Purchase Agreement (SPA) to individuals at DGI and Proskauer Rose, which was the law firm representing DGI. The same day, a certificate of incorporation in Delaware was filed for Humboldt Shelby Holding Corporation (HSHC), listing Mr. Haber as the sole shareholder and president. Lana Yang, an associate at Proskauer, informed Shearman & Sterling and Keswick that the purchaser would actually be HSHC, not Mr. Haber or DGI.

HSHC worked out the terms of its loans with Rabobank. On December 3, 2002, Rabobank emailed DGI and Proskauer initial drafts of documents related to HSHC's financing. This included a draft Promissory Note that listed conditions precedent that had to be met for a wholly-owned subsidiary of Rabobank, Utrecht-America Finance Company (UAFC), to advance $95 million to HSHC. UAFC would not make the advance until HSHC and UBS PaineWebber had "executed and delivered a purchase agreement." *Id.* at 243 (citation omitted). And while the Promissory Note did not list the execution of a Note Purchase Agreement as a condition precedent, the email also included a draft agreement that contemplated that Humboldt and Shelby would "sell, assign and transfer" to Rabobank the Dunwalke, Thornton, and Shelby Notes. *Id.* (citation omitted).

The same day, Mr. Haber emailed Mr. Kershaw and Ms. Yang with the subject line "Humboldt and Shelby notes." *Id.* (citation omitted). The email explained that "[s]hortly after the closing, Humboldt and Shelby will be selling the notes to Rabobank. In connection with that sale, we will need to arrange for Rabobank to become a beneficiary under the Chase and Citibank letters of credit." *Id.* (citation omitted). Also on the same day, the directors of Humboldt and Shelby agreed to "establish one or more accounts at UBS PaineWebber Incorporated for the purpose of holding certain of the Corporation's cash and securities." *Id.* (citation omitted).

14                                   DILLON TRUST COMPANY LLC v. US

From November 27 to December 23, 2002, Shearman & Sterling and Proskauer exchanged versions of the SPA, negotiating the terms. On December 9, 2002, Ms. Yang sent Mr. Kershaw a marked-up copy of the SPA. Ms. Yang changed the language "each Company will retain a substantial portion of its assets" to "each Company will retain substantial assets." *Id.* at 244 (citation omitted). On December 11, 2002, Mr. Kershaw emailed Proskauer and DGI a blackline version of the SPA, as well as a blackline version of the Humboldt Escrow Agreement. The Dillon trusts accepted Ms. Yang's revision from retaining a "substantial portion" of assets to "substantial assets." *Id.* (citation omitted). The Dillon trusts also added the language: "Humboldt will retain ownership of the Humboldt Notes for a period of at least one year from their respective issue dates and Shelby will retain ownership of the Shelby Note for a period of at least one year from its issue date." *Id.* (citation omitted). To the language "[t]he Purchaser shall be responsible for . . . ," the Dillon trusts added "[t]axes attributable to the sale, exchange or disposition of the Notes after Closing." *Id.* (citation omitted).

On December 12, 2002, Ms. Yang emailed Mr. Kershaw and Mr. Rooney with amended and restated installment notes. She wrote: "Per Rabobank's request, please forward the drafts of the proposed amended and restated notes for Thornton, Dunwalke and Shelby as soon as possible." *Id.* (citation omitted). That same day, Mr. Kershaw sent Proskauer and DGI draft amendments to the three notes, leaving a blank for an additional eligible assignee. Mr. Haber instructed Rabobank International be added as the Eligible Assignee.

On December 16, 2002, Ms. Yang sent Mr. Kershaw a marked-up SPA where, next to the Dillon trusts' latest addition on retaining ownership of the notes, she wrote: "No—deal is Humboldt will retain Thornton Note until Jan 1, '03 and Dunwalke until July 1, '03 and Shelby will retain its note until July 1, '03." *Id.* (citation omitted).

Ms. Yang also struck out the Dillon trusts' addition that "[t]he Purchaser shall be responsible for . . . [t]axes attributable to the sale, exchange or disposition of the Notes after closing." *Id.* (citation omitted). On December 18, 2002, Mr. Kershaw emailed Proskauer and DGI about disclosure schedules. The email attached a blackline version of the SPA. The Dillon trusts adopted the dates that Ms. Yang proposed regarding retention of the installment notes. The Dillon trusts added the emphasized language: "The Purchaser shall be responsible for, and indemnify the Sellers against . . . *Taxes of the Companies (for any Tax Period before or after Closing)* attributable to *the breach of any covenant set forth in Section 5.02 (including, without limitation*, the sale, exchange or *other* disposition of the Notes after Closing *(including a pledge treated as such for U.S. federal income tax purposes.))*." *Id.* at 245 (omission in original) (citation omitted).

The stock sale closed on December 23, 2002. As part of closing, HSHC's account at Rabobank reflected a wire transfer of $86.33 million, representing the payment for the Humboldt and Shelby stock. In order to finance the purchase, Mr. Haber signed a promissory note to Rabobank as the president of HSHC, agreeing to repay the principal amount of a loan up to $95 million. He pledged the stock from Humboldt and Shelby. Separately, Mr. Haber signed an additional promissory note to Rabobank as the president of Humboldt, agreeing to repay the principal amount of $28.7 million. He pledged the Thornton Note and the Dunwalke Note. In addition, Mr. Haber signed a third promissory note to Rabobank as the president of Shelby, agreeing to repay the principal amount of $5.1 million. He pledged the Shelby Note. HSHC's account at Rabobank was then credited with $90 million, $28.6 million, and $5 million.

On December 23, 2002, HSHC sold the portfolio of stocks held by Humboldt and Shelby to UBS PaineWebber for about $50.5 million. On December 24, 2002, Shelby

transferred $6 million from its UBS PaineWebber account to HSHC's Rabobank account. On December 27, 2002, the proceeds from the sale of Humboldt and Shelby's portfolio of securities were credited to Humboldt and Shelby's UBS PaineWebber accounts. HSHC repaid the $90 million loan to Rabobank.

The Dillon trusts were aware that the SPA allowed HSHC to pay the Shelby and Dunwalke installment notes early. On July 21, 2003, Shelby Farms LLC was notified that the Shelby Note payable to Shelby, due September 19, 2005, was assigned to UAFC. On July 29, 2003, Dunwalke Farm Property LLC was notified that the Dunwalke Note payable to Humboldt, due August 9, 2005, was assigned to UAFC.

II

The parties do not dispute that, following the close of the deal, Mr. Haber caused Humboldt and Shelby to engage in abusive "Son-of-BOSS transactions" designed to generate fictitious losses between December 24, 2002 and May 5, 2003. There is also no dispute that the Dillon trusts were not involved in those transactions.

On August 14, 2004, HSHC filed an income tax return for the tax year from December 23, 2002 to November 30, 2003. The return reported a capital gain of $42.86 million from the sale of Humboldt and Shelby's investment portfolios. The return also reported capital gains of $15.36 million, $3.96 million, and $11.0 million from the sales of the Thornton, Shelby, and Dunwalke Notes. HSHC thus reported total gains of $73.2 million. However, it also reported $74.1 million in losses. Theoretically, these losses could offset any tax liability for the reported gains. HSHC therefore paid no taxes associated with Humboldt and Shelby.

On August 14, 2007, the IRS issued a statutory notice of deficiency to HSHC. The IRS determined that the losses claimed were artificial and that HSHC owed $25.6 million

in income tax and $10.2 million in gross valuation misstatement penalty, along with underpayment interest. The U.S. Tax Court upheld the IRS Commissioner's decision and the Second Circuit affirmed. *See Humboldt Shelby Holding Corp. v. Comm'r*, T.C. Memo. 2014-47, 2014 WL 1041485 (2014), *aff'd*, 606 F. App'x 20 (2d Cir. 2015). HSHC did not pay the taxes, penalties, and interest assessed against it.

On November 20, 2014, the IRS notified the Dillon trusts that were parties to the stock sale with HSHC that they may be held liable as transferees under 26 U.S.C. § 6901 for HSHC's unpaid taxes, penalties, and interest. Acting on behalf of all the Dillon trusts, the Dillon Trust Company informed the IRS that six of the nine original trusts that were party to the stock sale had been terminated. The Dillon Trust Company provided a list of successor trusts that would be liable for any assessments made against the terminated trusts. In May 2015, the Dillon Trust Company made a $71.7 million deposit—not a payment—under 26 U.S.C. § 6603 in case the IRS asserted transferee liability. The Dillon Trust Company intended the $71.7 million to be posted as separate deposits for different taxpayer accounts—including the still existing original trusts and the various successor trusts—to cover each of their potential liabilities. These deposits were intended to stop the accrual of interest on any transferee liability the IRS assessed against the Dillon trusts. However, the deposit was posted to the general ledger account and not to the individual taxpayer's account for each trust.

The IRS asserted such liability on October 25, 2016, issuing notices of transferee liability to the Dillon trusts that were originally parties to the stock sale. The Dillon Trust Company requested that the IRS use portions of the § 6603 deposit as payments for the assessed liabilities. But, by March 2017, the IRS had not applied any of the deposits as payments. When the Dillon Trust Company inquired as to the status of the deposits, IRS Agent Timothy Stern

addressed the discrepancies between the trusts that owed the liabilities and the trusts making the deposits, explaining that "the [IRS]'s procedures do not authorize a person to direct the [IRS] to apply a deposit to pay another person's liability." *Dillon Tr. Co. LLC v. United States*, 162 Fed. Cl. 708, 713 (2022) ("*Summary Judgment Order*") (citation omitted). He advised the Dillon Trust Company to request the return of the deposits so that the trusts could make the liability payments with the returned money. Following this, the Dillon Trust Company requested the IRS return the deposits for only certain of the successor trusts' liability. The IRS notified the Dillon Trust Company that it applied the deposits for Trust 709204 and Trust 709210—which were both original trusts to the stock sale—for their respective liabilities as of May 2017. However, no other deposits were applied as payments. In October 2017, the IRS returned the remainder of the deposits, plus interest. The Dillon trusts paid in full the assessed transferee liabilities, which totaled approximately $79.9 million.

## III

In December 2017, the Dillon Trust Company brought suit in the Court of Federal Claims, seeking a refund of all taxes, penalties, and interest paid by the Dillon trusts as transferees of HSHC.[6]

The Government moved for partial summary judgment, challenging the Dillon Trust Company's interest-related claim. Specifically, the Dillon Trust Company argued

---

[6]   Originally, nine Dillon trusts filed separate actions in the Court of Federal Claims, which were consolidated. Then, six of the cases were voluntarily dismissed without prejudice, leaving only Trust 709204, Trust 709210, and Trust 8545 as plaintiffs, with the Dillon Trust Company acting on their behalf. The parties agree that the liabilities of other trusts will be determined by this case.

that the alleged underpayment interest on HSHC's tax deficiency should not have accrued beyond May 8, 2015, the date when the IRS posted the Dillon trusts' 26 U.S.C. § 6603 deposit.  The Court of Federal Claims granted the Government's motion, holding that the continued accrual of interest by the IRS after the Dillon trusts made their § 6603 deposit did not violate the law, and therefore an illegal exaction claim could not be pursued.  *See generally Summary Judgment Order*, 162 Fed. Cl. 708.

A trial on the remainder of the Dillon Trust Company's claims followed.  After trial, the Court of Federal Claims issued an order finding that the stock sale between the Dillon trusts and HSHC and the subsequent asset sales by HSHC could be collapsed into one transaction.  Thus, the Government had demonstrated under New York state law that the Dillon trusts were transferees of HSHC and therefore liable pursuant to 26 U.S.C. § 6901 for HSHC's unpaid taxes, penalties, and interest.

The Dillon Trust Company appeals.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

On appeal, the Dillon Trust Company challenges the Court of Federal Claims' decisions (1) to impose transferee liability on the Dillon trusts; (2) to not limit their transferee liability to the net value they received from HSHC; (3) to hold the Dillon trusts liable for the gross valuation misstatement penalty that HSHC incurred for claiming bogus losses on its tax return; and (4) to hold on summary judgment that the Dillon Trust Company could not make an illegal exaction claim based on the continued accrual of interest after the Dillon trusts made deposits according to 26 U.S.C. § 6603.  We take each issue in turn.

"We review the Court of Federal Claims' legal conclusions de novo and its fact findings for clear error." *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1368 (Fed. Cir. 2020) (citation omitted).  "A fact finding is

'clearly erroneous' when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004)). "We review the Court of Federal Claims' grant of summary judgment de novo." *Aviation & Gen. Ins. Co. v. United States*, 882 F.3d 1088, 1093 (Fed. Cir. 2018). "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted).

I

The Dillon Trust Company challenges the Court of Federal Claims' determination that the stock sale between the Dillon trusts and HSHC and HSHC's later asset sales between Humboldt and Shelby and third parties could be collapsed such that they are treated as a single transaction—and thus, the Dillon trusts could be held liable to the IRS as transferees of HSHC under 26 U.S.C. § 6901. The Dillon Trust Company argues that the Court of Federal Claims erred (1) in finding that the Dillon trusts had inquiry notice of Mr. Haber's entire scheme to sell Humboldt and Shelby's assets and fraudulently evade the resulting tax liability; (2) in finding that the intent to commit tax fraud was the only economically plausible explanation for the auction bids the Dillon trusts received; (3) in finding that the Dillon trusts had constructive knowledge of the entire scheme when they took no "active steps" to avoid learning of it; and (4) in extending Second Circuit case law to assist the IRS. We disagree.

A

Pursuant to 26 U.S.C. § 6901, the IRS may collect any deficiency or underpayment of income tax from a party other than the originally liable taxpayer if they are "transferees" of the taxpayer's property and have a "liability, at law or in equity." Section 6901 provides a procedural mechanism for the IRS to collect such unpaid taxes:

DILLON TRUST COMPANY LLC v. US                    21

(a) Method of collection[.]  The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) Income, estate, and gift taxes[.]

(A) Transferees[.]  The liability, at law or in equity, of a transferee of property—

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes)[] . . . .

26 U.S.C. § 6901(a).  The provision, however, does not create or define the substantive liability of a transferee, which is determined according to state law.  *Comm'r v. Stern*, 357 U.S. 39, 42 (1958).  Here, the state law at issue is that of New York.

New York adopted the Uniform Fraudulent Conveyance Act (NYUFCA) in 1925.  The Government primarily relied on the NYUFCA provision that permits a creditor to establish that a conveyance is fraudulent by establishing constructive fraud:

§ 273.  Conveyances by insolvent[.]  Every conveyance made and every obligation incurred by a person who is or will thereby be rendered insolvent is fraudulent as to creditors without regard as to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

22                              DILLON TRUST COMPANY LLC v. US

NYUFCA § 273 (2000).[7]    Other provisions of NYUFCA
would allow the Government to establish a fraudulent con-
veyance based on actual intent to commit fraud:

> § 276.  Conveyance made with intent to defraud[.]
> Every conveyance made and every obligation in-
> curred with actual intent, as distinguished from in-
> tent presumed in law, to hinder, delay, or defraud
> either present or future creditors, is fraudulent as
> to both present and future creditors.

NYUFCA § 276.

The Second Circuit has explained that "[i]t is well es-
tablished that multilateral transactions may under appro-
priate circumstances be 'collapsed' and treated as phases of
a single transaction for analysis under the [NY]UFCA."
*Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 186 (2d Cir.
2013) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623,
635 (2d Cir. 1995)).  A "paradigmatic scheme" for collapsing
a transaction is when a first "transferee gives fair value to
the debtor in exchange for the debtor's property, and the
debtor then gratuitously transfers the proceeds of the first
exchange to a second transferee.    The first transferee
thereby receives the debtor's property, and the second
transferee receives the consideration, while the debtor re-
tains nothing." *Id.* (quoting *HBE Leasing*, 48 F.3d at 635).
The Second Circuit explained that such a transaction can
be collapsed if two elements are met:

> "First, in accordance with the foregoing paradigm,
> the consideration received from the first transferee
> must  be  reconveyed  by  the  [party  owing  the

---

7    We cite to the statute as it existed at the time of the
relevant transactions.  *See* Uniform Fraudulent Convey-
ance Act of the New York Debtor and Creditor Law, codi-
fied at N.Y. Debt. & Cred. §§ 270–81 (McKinney 2000).  The
statute has since been modified.

DILLON TRUST COMPANY LLC v. US                    23

> liability] for less than fair consideration or with an actual intent to defraud creditors."   "Second, . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent."

*Id.* (alteration and omission in original) (footnote and internal citation omitted) (quoting *HBE Leasing*, 48 F.3d at 635).   The Government bears the burden of proof in establishing whether a party had actual or constructive knowledge of the entire scheme.   *Id.* at 186 n.8.

In *Diebold*, the first element was not contested, and the parties only disputed whether the shareholders who sold their C corporation in a stock sale had actual or constructive knowledge of the entire scheme that rendered the exchange fraudulent.   *Id.* at 186–87.   In *Deibold*, Double D Ranch, Inc., a C corporation, sold all of its assets in a stock sale through Sentinel Advisors, LLC, which used a newly formed entity created solely to carry out the transaction, Shap Acquisition Corporation II.   *Id.* at 176, 178.   Sentinel intended to purchase Double D's stock through Shap II with financing from Rabobank.   *Id.* at 178.   Sentinel planned on having Shap II immediately sell Double D's securities portfolio and use the proceeds of that sale to repay the loan from Rabobank.   *Id.*   After Double D and Shap II carried out the stock sale, Shap II delivered the securities portfolio to Morgan Stanley, who wired funds to Rabobank, thus paying off the loan that Shap II used to purchase Double D's stock.   *Id.* at 180.   Shap II filed a consolidated tax return with Double D that reported all of Double D's built-in gains from its asset sales, as well as sufficient losses by Shap II to offset the gains, resulting in no net tax liability.   *Id.* at 181.   The IRS issued a notice of deficiency against Double D, as it determined the sale of Double D's stock was essentially an asset sale followed by a liquidating distribution to the original shareholders of Double D.   *Id.*   However, the IRS also determined that efforts to collect from

24                          DILLON TRUST COMPANY LLC v. US

Double D would be futile and so attempted to collect from its original shareholders as transferees. *Id.*

In *Diebold*, the Second Circuit looked to NYUFCA § 273 to determine whether the stock sale and later asset sale could be collapsed such that transferee liability attached to the original shareholders. In holding that the shareholders of Double D had constructive knowledge of the entire fraudulent scheme, the Second Circuit explained that "constructive knowledge does not require a showing that the party had actual knowledge of a scheme; rather, it is sufficient if, based upon the surrounding circumstances, they 'should have known' about the entire scheme." *Id.* at 187 (quoting *HBE Leasing*, 48 F.3d at 636). "Constructive knowledge in this context also includes 'inquiry knowledge'—that is, where transferees 'were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but . . . failed to make such inquiry.'" *Id.* (omission in original) (quoting *HBE Leasing*, 48 F.3d at 636). The Second Circuit acknowledged there is some ambiguity in New York law on whether constructive knowledge requires either "the knowledge that ordinary diligence would have elicited," or "more active avoidance of the truth." *Id.* (citation omitted). *Diebold* did not resolve this ambiguity, however, "because the facts [t]here demonstrate[d] both a failure of ordinary diligence and active avoidance of the truth." *Id.*

The Second Circuit went on to consider "the totality of the circumstances," identifying several key facts. *Id.* at 188. The Second Circuit found "it is of great import that the Shareholders recognized the 'problem' of the tax liability arising from the built-in gains on the assets held by Double D," and "specifically sought out parties that could help them avoid the tax liability inherent in a C Corp holding appreciated assets." *Id.* The Second Circuit also considered that "[t]he parties to th[e] transaction were extremely sophisticated actors." *Id.* In "[c]onsidering their sophistication, their negotiations with multiple partners to

DILLON TRUST COMPANY LLC v. US                25

structure the deal, their recognition of the fact that the amount of money they would ultimately receive for an asset or stock sale would be reduced based on the need to pay the C Corp tax liability, and the huge amount of money involved," the Second Circuit concluded that the shareholders "knew, or at least should have known but for active avoidance, that the entire scheme was fraudulent and would have left Double D unable to pay its tax liability." *Id.*

But the Second Circuit did not stop there.  It also explained that the shareholders "had a sophisticated understanding of the structure of the entire transaction," as (1) "Shap II was a brand new entity that was created for the sole purpose of purchasing Double D stock"; (2) they "had notice, by means of the draft stock purchase agreement, that Shap II intended to sell Double D's securities to Morgan Stanley" "immediately upon closing"; (3) the shareholders struck "specific language referencing Morgan Stanley" from their agreement; and (4) the shareholders intervened with Morgan Stanley when their closing with Shap II was delayed, which necessarily delayed Shap II's sale of Double D's securities portfolio to Morgan Stanley. *Id.* at 188–89.  The Second Circuit held that this "was more than sufficient to demonstrate an awareness that Shap II was a shell that did not have legitimate offsetting losses or deductions to cancel out the huge built-in gain it would incur upon the sale of the Double D securities." *Id.* at 189.

The Second Circuit concluded that "these circumstances should have caused the Shareholder representatives to inquire further into the supposed tax attributes that allegedly would have allowed Shap II to absorb the tax liability of which the Shareholders had intimate knowledge and which indeed was the very reason they structured this deal in the first instance." *Id.*  The Second Circuit also explained that, under the facts of *Diebold*, the shareholders "had a duty to inquire further into the circumstances of the transaction" and the "term in the stock purchase

26 DILLON TRUST COMPANY LLC v. US

agreement allocating liability for the taxes to Shap II and Double D [wa]s insufficient to relieve the Shareholders of th[is] duty." *Id.* (citation omitted). The Second Circuit further held that:

> [W]hen entering into a particular transaction for the express purpose of limiting—or altogether avoiding—tax liability, parties are all the more likely to have this duty to inquire. In such cases, the surrounding circumstances always include a deliberate effort to avoid liability, and it would be the very rare case indeed where a purchasing party would assume such liability without an appropriate discount in the sale price. In such scenarios, being aware that this is the case, parties have a duty "to inquire further into the circumstances of the transaction."

*Id.* at 190 (footnote omitted) (quoting *HBE Leasing*, 48 F.3d at 636).

B

The Court of Federal Claims determined *Diebold* was "[t]he most useful case for analyzing [the] facts" here and "gives [the court] the basic legal framework to apply." *Post-Trial Order*, 168 Fed. Cl. at 249, 252. After analyzing *Diebold* in depth, the Court of Federal Claims came away with seven factors to consider and apply to this case:

> *First*, and of "great import" to the court was that the Shareholders recognized the "problem" of the tax liability arising from the built-in gains on the assets held by Double D and sought out parties that could help them avoid the tax liability inherent in a corporation holding appreciated assets. [*Diebold*,] 736 F.3d at 188. *Second*, the "parties to this transaction were extremely sophisticated actors, deploying a stable of tax attorneys." *Id.* *Third*, the shareholder representatives had a "sophisticated understanding" of the structure of the

entire transaction. *Id.  Fourth*, they knew that the buyer was a "brand new entity that was created for the sole purpose of purchasing Double D stock." *Id. Fifth*, they knew that the new entity was going to promptly sell the assets.  *Sixth*, language was stricken from the stock purchase agreement concerning one of the purchasers. *Id.* at 189.  *Seventh*, the sellers actively pushed for the closing date to be moved one day to accommodate sale of the assets. *Id.*

*Post-Trial Order,* 168 Fed. Cl. at 252 (emphases added) (footnote omitted).  The Court of Federal Claims ultimately concluded that the Dillon trusts were both on inquiry notice of the general outline of Mr. Haber's scheme and deliberately chose to remain ignorant of what further inquiry might have revealed in the face of indicators of potential fraud.

In reaching this conclusion, the Court of Federal Claims considered extensive expert testimony, including (1) the Dillon Trust Company's expert, Professor Guhan Subramanian, who testified about the adequacy of the Dillon trusts' due diligence, about the appropriateness of the auction used, and responded to the Government's purported "red flags"; (2) the Government's expert, R. Jeffrey Malinak, who testified on how HSHC was insolvent immediately after the stock sale; and (3) the Government's second expert, Professor Jennifer Blouin, who testified about the lack of non-tax motivations or foreseeable economic benefits from the stock sale and about the existence of certain "red flags" that should have alerted the Dillon trusts that HSHC's purchase was motivated by possible tax fraud.

The Court of Federal Claims summarized Professor Subramanian's testimony as opining that no due diligence was required on the part of the Dillon trusts because it was a cash sale done via an auction while not including certain relevant opinions or offering opinions outside of his

28                          DILLON TRUST COMPANY LLC v. US

expertise.   For example, Professor Subramanian did not
opine on the market conditions in 2002 and whether there
would have been an influx of buyers with NOLs, nor did he
opine on why it was reasonable for the Dillon trusts to have
believed that there would have been such buyers.  Addi-
tionally, the Court of Federal Claims found that any testi-
mony from Professor Subramanian that it was reasonable
for the Dillon trusts to conclude that higher bids were the
result of bidders' tax attributes was outside of his expertise
and unpersuasive.  In fact, the Court of Federal Claims ex-
plained that "[t]he only factual fig leaf that [the trusts] can
point to was their testimony that NOLs would have been
abundant in buyers of assets at the time of sale," but this
"was not otherwise supported by Professor Subramanian,
or anywhere else in the record, and which was soundly un-
dercut by defendant's experts' more direct testimony on the
point."  *Id.* at 254.  The Court of Federal Claims also ex-
plained that Professor Subramanian conceded that a seller
will typically further engage in due diligence when a buyer
refuses to agree to a representation that is important to the
seller, when the buyer has a continuing relationship with
the seller, and when the buyer has a negative reputation,
all factors present in this case.

The Court of Federal Claims also summarized the Gov-
ernment's expert testimony.  Mr. Malinak explained how
"the bids received[, which] were well in excess of fair mar-
ket value[,] . . . [were] not economically rational unless the
bidders believed that they could avoid, for a relatively low
cost, all of the assumed tax liability."[8]  *Id.* at 255.  But he
also explained that "there would be no incentive for a ra-
tional buyer to use accumulated NOLs as part of the pur-
chase price to offset embedded gain.  That buyer could go

---

[8]   Mr. Malinak  estimated  that  the  approximately
$91 million in assets had approximately $26 million in em-
bedded tax liability.  Accordingly, the fair market value
once tax liability was taken into account was $65 million.

DILLON TRUST COMPANY LLC v. US                    29

into the marketplace and purchase identical assets at the same market value *without* giving up an asset of their own (its accumulated NOLs)." *Id.* Moreover, "[a]s a non-operating holding company, HSHC could not be expected to have any operating losses. Further, as a newly formed entity, HSHC could not be expected to have any capital losses. Nor was there a parent entity of HSHC that could be expected to have NOLs." *Id.* There was also no "additional value" to obtaining Humboldt and Shelby, thus "the bidders were paying a substantial premium in excess of fair market value that had no rational basis given the unlikelihood of any legitimate way to absorb the tax liability or to generate additional value." *Id.* at 256. This meant that the "only logical explanation for the two excessively high and similar bids is that both bidders anticipated a tax avoidance strategy that would allow them to escape paying most or all of the embedded tax liability on the underlying assets." *Id.* Mr. Malinak also explained that HSHC's "[i]nsolvency . . . was readily predictable," as "the mere fact that this was a new entity, operating entirely with borrowed funds, should have been sufficient to put the stock sellers on notice that the Stock Sale would have to be followed virtually immediately by an asset sale, triggering all or part of the tax liability."[9] *Id.*

Professor Blouin also opined that "the premium paid by HSHC made no economic sense." *Id.* at 257. She bolstered

---

[9]    Mr. Malinak explained that HSHC was insolvent immediately after the stock sale because it borrowed nearly $124 million from Rabobank and, while sale of the stocks, the installment notes, and borrowing $6 million in cash from the corporations gave HSHC over $127 million in assets, there was $15 million in federal tax on the realized gains associated with the stocks and $10 million in federal tax on the unrealized gains associated with the notes. Accordingly, on the day of the sale, HSHC was insolvent by nearly $23 million.

Mr. Malinak's opinions on several points, *see id.*, and additionally explained that the use of an auction in this case was "a mystery," as "auctions make sense for hard-to-value assets," but here "it would be simple to calculate the precise value of the assets inside Humboldt and Shelby because they consisted of cash, high quality notes and stocks." *Id.* The Court of Federal Claims credited this testimony as reasonable and found that "[t]he utility of the auction in this case was not to get a better understanding of the true market value of the assets (less the known tax liability), but to hope to find a buyer able, or at least willing, to ignore the true fair market value of the companies." *Id.* at 257–58. And, based on the Government's expert testimony, the Court of Federal Claims "conclude[d] that there was no legitimate economically rational explanation for the DGI and TranStar bids." *Id.* at 258.

The Court of Federal Claims also found reasonable Professor Blouin's testimony taking issue with Professor Subramanian's conclusions that the Dillon trusts did not need to be "too fussy about their buyer." *Id.* The Court of Federal Claims agreed with her, stating that the Dillon trusts "knew that a sword of Damocles always hung over their heads" and "had every reason to be concerned about events after the Stock Sale, and indeed had been warned by [Mr.] Bambino about that possibility." *Id.*

Professor Blouin also testified to a series of circumstances surrounding the transaction that were "red flags" that should have indicated to the Dillon trusts that DGI's offer was too good to be true. *Id.* And while the Court of Federal Claims did not credit all of the red flags Professor Blouin pointed to, it did agree with several factors Professor Blouin raised, including "[t]he first and most important red flag," "the total absence of any economic validity to the bids." *Id.* The Court of Federal Claims found that:

It made no economic sense for two bidders to show up offering prices at virtually full value of the underlying assets. There was no mystery here in this

> regard other than that created by [the trusts]' own desire to remain ignorant, or to feign ignorance. The taxpayers are sophisticated entities advised on tax matters by an in-house firm, Keswick, and a prestigious international law firm. In fact, the record shows that [Mr.] Bambino warned of the consequences of selling to certain tax aggressive entities several times.

*Id.* The Court of Federal Claims also credited Professor Blouin's concern over "the general pushback by DGI on making any promises to hold assets for a lengthy period," including (1) having changed the wording of the agreement from requiring HSHC to hold a "substantial proportion" of assets for one year to the less meaningful commitment of maintaining "substantial assets"; and (2) insisting on the right to immediately sell one of the notes and the others within seven months. *Id.*

The Court of Federal Claims further took note of at least two publicly reported opinions that a search for DGI or Mr. Haber would have turned up. It found that at least one of these opinions indicated that "[t]he IRS [had been] currently investigating whether DGI ha[d] violated the tax laws regarding the registration and maintenance of records concerning tax shelters." *Id.* at 259 (first alteration in original) (quoting *United States v. Diversified Grp., Inc.*, No. M-18-304, 2002 WL 31947904, at *1 (S.D.N.Y. Nov. 25, 2002)).

The Court of Federal Claims further credited Professor Blouin's testimony as "her experience and training [is] particularly relevant because the focus of her work is on how taxes affect business decision-making and how tax considerations can be distinct from other economic considerations," and it compared this favorably to Professor Subramanian "who declined to apply any tax considerations to his opinions." *Id.* "In sum, [Professor] Blouin and [Mr.] Malinak persuade [the court] that there was nothing routine about the Stock Sale." *Id.* at 260.

After assessing the expert testimony and totality of the factual circumstances, the Court of Federal Claims went on to find, in this case, "that the accumulated tax liability was both known to a high degree of precision by [the trusts] (nearly $26 million), and was a driving consideration," which was "the same factor the court in *Diebold* found to be of 'great import.'" *Id.* at 259. The Dillon trusts were also "actually aware that, if the stock sale attracted a company which sold the appreciated assets, the stock sale and subsequent asset sales would trigger scrutiny by the IRS and that the agency might treat the transactions as a de facto asset sale by [the trusts]." *Id.* The Court of Federal Claims further found that Mr. Bambino and his clients knew enough about the potential buyer "to generate 'red flags' that ought to have resulted in further inquiry." *Id.*; *see also id.* at 259–60.

Accordingly, the Court of Federal Claims found that, "[a]t a bare minimum, there were plenty of indicators of the possibility of fraud that [the trusts] were on inquiry notice to go further and attempt to assure themselves that [Mr.] Haber was not planning to sell the assets quickly and that he had the means to absorb the tax liability if he did." *Id.* at 260. The Court of Federal Claims further explained that "[i]t is no answer to say, '[Mr.] Haber would not have revealed his plans to us,'" which was "no doubt true, but, under the circumstances, that would be further proof that [the trusts] could not deal with him in presumed innocence, or in good faith." *Id.* The Court of Federal Claims concluded that the Dillon trusts "clearly did not want to know the facts about HSHC because that would have jeopardized their ability to accept an unrealistic bid for the corporate stock," and their lack of due diligence "was not because they knew it would have been pointless due to the bona fides of the bidders, but rather that [the trusts] and their counsel did not want to know what an investigation would reveal, because then they would be accountable for dealing with the results." *Id.* This was willful ignorance and such

"willful ignorance is sufficient to demonstrate constructive knowledge of fraud." *Id.*

Accordingly, the Court of Federal Claims collapsed the stock sale with the subsequent asset sales. The Government had met its burden to show that: (1) the IRS was a creditor at the time of the conveyance; (2) the conveyance lacked fair consideration, because $86.8 million was not a fair equivalent for corporations with a value of $65 million once the embedded tax liability was accounted for; (3) the Dillon trusts had constructive knowledge of the entire scheme; and (4) the conveyance resulted in HSHC's insolvency, which left the IRS unpaid. The Dillon trusts were thus liable as transferees under New York law and 26 U.S.C. § 6901.

C

Under this framework, the Dillon Trust Company challenges only the Court of Federal Claims' finding of constructive knowledge on appeal. But we see no error in the Court of Federal Claims' finding that the Dillon trusts had constructive knowledge of the entire fraudulent scheme and resulting decision to collapse the transactions in order to assign transferee liability to them. First, the Court of Federal Claims used the proper framework for 26 U.S.C. § 6901 and NYUFCA § 273, as laid out in *Diebold*. Second, under that framework, this issue is a highly factual inquiry. The Court of Federal Claims provided a detailed analysis of the evidence, thorough and reasonable fact findings, and credibility determinations based on observations made at a multi-week trial.

The Court of Federal Claims, having analyzed *Diebold* and identifying seven facts key to the Second Circuit's holding that the shareholders there had constructive knowledge of the entire fraudulent scheme, found similar factual circumstances here. First, and of "great import," the Dillon trusts "knew" they "were marketing assets with a built-in tax liability of $26 million" and were seeking "a

highly unique purchaser [who] would not price its bid accordingly." *Post-Trial Order*, 168 Fed. Cl. at 259; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). This is despite being warned that a "stock sale and subsequent asset sales would trigger scrutiny by the IRS and that the agency might treat the transactions as a de facto asset sale by" the Dillon trusts. *Id.* at 259; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). Second, these were sophisticated parties. *Id.* at 258; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). Third, as to having a sophisticated understanding of the transaction's entire structure, while "DGI would not disclose its plans for the assets of Humboldt and Shelby," the Dillon trusts' "acceptance of [DGI's] explanation of 'proprietary' concerns was either monumental naivete, gross negligence, or a useful fig leaf." *Id.* at 260; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). Based on the totality of the facts, the Court of Federal Claims found "the latter to be the truth." *Id.* at 260. Fourth, the Dillon trusts "knew or had reason to know that HSHC was a newly formed entity under the control of James Haber, with *de minimis* assets, which borrowed substantially all of the purchase price using the assets of Humboldt and Shelby as collateral, and that the loans . . . would trigger a need to sell assets and thereby trigger tax liability in Humboldt and Shelby." *Id.* at 259; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). They also knew HSHC was created for the purpose of buying Humboldt and Shelby. *See id.* at 260; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). And "[e]ven the most rudimentary inquiry would have revealed the unlikelihood that HSHC itself had any useable NOLs because it was not and had never been an operating company." *Id.* at 259–60; *see also id.* at 252 (quoting *Diebold*, 736 F.3d at 188). Fifth, the Dillon trusts were aware that HSHC was going to promptly sell the corporations' assets, as "[t]hey knew that some of the notes would be pledged for cash immediately and that all the notes could be redeemed by the end of July 2003,

DILLON TRUST COMPANY LLC v. US                                    35

well in advance of their maturity dates." *Id.* at 260; *see also id.* at 252.

The sixth and seventh facts identified in *Diebold* related to language being stricken from the stock purchase agreement concerning a later purchaser of the corporation's assets and the corporation's original shareholders accommodating the almost immediate sale of the asset following the stock sale. *See id.* at 252 (citing *Diebold*, 736 F.3d at 189). Here, the Court of Federal Claims found that the Dillon trusts "knew that the negotiations over the terms of the SPA left DGI with permission to sell virtually whatever it wanted of the assets transferred." *Id.* at 260. The negotiations also revealed to the Dillon trusts "that the Thornton note would be turned into cash immediately by being pledged to Rabobank and that the remaining notes could be pledged before the end of July, in advance of their maturity dates." *Id.* This meant "that HSHC, a 'thinly capitalized' [special purpose vehicle (SPV)] would immediately become obligated to deal with the tax consequences of those sales." *Id.*[10]

None of the trial court's fact findings leave us "with the definite and firm conviction that a mistake has been committed." *Gadsden Indus. Park*, 956 F.3d at 1368 (quoting *Am. Pelagic Fishing*, 379 F.3d at 1371). Indeed, the Dillon Trust Company does not dispute any of the facts found by the Court of Federal Claims, merely the implications the trial court drew from them. But these assessments were also backed by the Court of Federal Claims' consideration

---

[10]    In addition to the facts it found analogous to those in *Diebold*, the Court of Federal Claims found that members of the Dillon trusts' team should have known "[t]hat [Mr.] Haber and DGI were being investigated by the IRS for potential violation of tax laws regarding the registration and maintenance of records concerning tax shelters." *Post-Trial Order*, 168 Fed. Cl. at 260.

of expert testimony, including which experts provided credible theories within their areas of expertise. And such credibility determinations were well within the trial court's discretion. *See Cordis Corp. v. Bos. Sci. Corp.*, 658 F.3d 1347, 1361 n.6 (Fed. Cir. 2011) ("[I]t [i]s the province of the district court to determine credibility, and '[t]his court gives great deference to the district court's decisions regarding credibility of witnesses.'" (third alteration in original) (quoting *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378–79 (Fed. Cir. 2000))). And to the extent the Dillon Trust Company argues certain facts were not as significant as the Court of Federal Claims found them to be, as an appellate court we do not reweigh facts on appeal. *See Nutrinova Nutrition Specialties & Food Ingredients GmbH v. Int'l Trade Comm'n*, 224 F.3d 1356, 1359 (Fed. Cir. 2000) ("Even if we might have found some of the facts differently, or even if we might have drawn some inferences from the facts differently, none of which we are inclined to do, that is not the role of an appellate court. Nutrinova invites us to reweigh the evidence and reexamine the credibility of the witnesses. We decline the invitation.").

The Dillon Trust Company argues that the Court of Federal Claims erred in finding the Dillon trusts had inquiry notice of the entire scheme. Specifically, they assert that inquiry notice only applies "constructive knowledge [to] *the facts that a reasonable inquiry would have revealed. But [the party] is not charged with knowledge of facts that would not have been revealed.*" Appellant's Br. 18. And here, the Dillon Trust Company contends, the evidence showed that Mr. Haber refused to share his plans for Humboldt and Shelby because they were "proprietary." Appellant's Br. 18 (citation omitted). According to the Dillon Trust Company, this means that, "since reasonable inquiry here would not have revealed [Mr.] Haber's entire scheme to the [trusts], the [trusts] cannot be charged with constructive knowledge of that entire scheme." Appellant's Br. 18–19. This position takes too narrow a view of the

record and the legal doctrine. As the Court of Federal Claims found, "[i]t is no answer to say, '[Mr.] Haber would not have revealed his plans to us.'" *Post-Trial Order*, 168 Fed. Cl. at 260. The trial court found on the record before it that, while it was "no doubt true" that Mr. Haber would not reveal his fraud, this was merely "further proof that [the trusts] could not deal with him in presumed innocence, or in good faith." *Id.* Indeed, based on the facts and expert testimony discussed above, the Court of Federal Claims found the trusts were "remarkably uninterested in performing any serious due diligence," "not because they knew it would have been pointless due to the bona fides of the bidders, but rather that [the trusts] and their counsel did not want to know what an investigation would reveal" and did not want to "jeopardize[] their ability to accept an unrealistic bid for the corporate stock." *Id.* The Court of Federal Claims further found the Dillon trusts "wanted to make a virtue of willful ignorance so that they could profess to be innocent sellers." *Id.*

As we have explained, we see no clear error in the trial court's fact finding. Nor do we see any legal error, as inquiry notice is not limited to what would be revealed to the seller by directly inquiring with the buyer, as the Dillon Trust Company essentially proposes. Inquiry knowledge concerns when parties "were *aware of circumstances* that should have led them to inquire further into the circumstances of the transaction." *Diebold*, 736 F.3d at 187 (emphasis added) (quoting *HBE Leasing*, 48 F.3d at 636). "[P]arties [have a] duty to inquire based on all of the circumstances which they were aware. To relieve parties of this duty, when the surrounding circumstances indicate that they should further inquire, would be to bless the willful blindness the constructive knowledge test was designed to root out." *Id.* at 189–90. As the Court of Federal Claims found, the totality of the circumstances here was enough to put the Dillon trusts on notice that further inquiry into Mr. Haber, DGI, and HSHC was required.

The Dillon Trust Company next contests the Court of Federal Claims' finding that intent to commit tax fraud was the only economically plausible explanation for the bids it received from DGI and TranStar. But this is merely a request that this court reweigh how the trial court evaluated the facts and reevaluate the trial court's credibility determinations for competing expert testimony. As discussed, this is not the role of an appellate court, and we decline the Dillon Trust Company's invitation to do so. In addition, "when entering into a particular transaction for the express purpose of limiting . . . tax liability," "the surrounding circumstances always include a deliberate effort to avoid liability, and it would be the very rare case indeed where a purchasing party would assume such liability without an appropriate discount in the sale price. In such scenarios, being aware that this is the case, parties have a duty 'to inquire further into the circumstances of the transaction.'" *Diebold*, 736 F.3d at 190 (footnote omitted) (quoting *HBE Leasing*, 48 F.3d at 636).

The Dillon Trust Company further seeks to fault the Court of Federal Claims for not pointing to "active steps" the Dillon trusts took to avoid confirming Mr. Haber's fraudulent plan. This is belied by the record. The Court of Federal Claims found that the Dillon trusts chose to remain willfully ignorant in the face of "more than enough warning signals." *Post-Trial Order*, 168 Fed. Cl. at 260. We see no clear error in the fact findings that led to that conclusion, nor any legal error. *Diebold* explains that when a "duty to inquire based on all of the circumstances" has been created, the law will not "bless the willful blindness" of the parties "[t]o relieve [them] of this duty." *Diebold*, 736 F.3d at 189–90. Additionally, the Second Circuit has explained as part of the constructive knowledge inquiry that, "[u]nder [certain] circumstances, [the] failure to inquire represented a conscious turning away from the subject." *HBE Leasing*, 48 F.3d at 637.

DILLON TRUST COMPANY LLC v. US                          39

Finally, the Dillon Trust Company contends that the Court of Federal Claims improperly extended *Diebold*. But this is merely an argument that *Diebold* was not "on all fours with this case." Appellant's Br. 33. We disagree. While one case will almost never have the exact same facts as another, *Diebold* appears to be directly on point with a very similar fact pattern as to this case. We see no error in the Court of Federal Claims' application of *Diebold* to this case.

## II

We turn next to the Dillon Trust Company's argument that, even if the Dillon trusts are liable as transferees, the Court of Federal Claims violated NYUFCA § 278(2) by holding them liable for more than the net value of the transfer they received. The Dillon Trust Company argues that (1) because the Dillon trusts were held liable based on constructive knowledge of fraud under § 273, the Government cannot argue they had "actual fraudulent intent"; and (2) the Court of Federal Claims improperly imposed the burden of disproving "actual fraudulent intent" on the Dillon Trust Company and not the Government. We disagree.

If fraud is proven under either NYUFCA § 273 or NYUFCA § 276, the Government's remedy is set out in NYUFCA § 278:

> § 278. Rights of creditors whose claims have matured[.]
>
> 1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser.

> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
>
> b. Disregard the conveyance and attach or levy execution upon the property conveyed.
>
> 2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

NYUFCA § 278. Section 278(2) thus provides a cap on the amount a transferee is liable for where there is no "actual fraudulent intent" on the part of the transferee.

The Dillon Trust Company argued that any liability the Dillon trusts were responsible for was subject to this cap. The Court of Federal Claims considered the Dillon Trust Company's argument that there is a distinction between "constructive" fraud that triggers § 273 and the words of § 278, which refer to "actual fraudulent intent." The Court of Federal Claims acknowledged that "[t]he statute [wa]s unclear on whether the constructive fraud assumed under § 273 and actual fraudulent intent under § 278(2) are different from each other." *Post-Trial Order*, 168 Fed. Cl. at 261. However, the Court of Federal Claims noted "that the Second Circuit seems to have addressed the question directly . . . in *Ruderman v. United States*, 355 F.2d 995, 998 (2d Cir. 1966)." *Id. Ruderman* explains that "actual fraud is not limited to fraudulent conveyances which fall within the definitions of § 276 . . . , but may include transfers which are denoted as 'constructively fraudulent' and which fall, for example, within § 273." *Ruderman*, 355 F.2d at 998. The Court of Federal Claims explained that, if *Ruderman* controls, then having found constructive fraud on the part of the Dillon trusts, the court would not also find that they acted without actual fraudulent intent. The Court of Federal Claims went on to find that, even if *Ruderman* did not control, there were "badges

of fraud" in this case that prevented the Dillon trusts from showing they lacked actual fraudulent intent as required by § 278. *Post-Trial Order*, 168 Fed. Cl. at 261–62.

*Ruderman* seemingly forecloses the Dillon Trust Company's challenge. The Dillon Trust Company reiterates on appeal that there is a material difference between § 273's constructive fraud provision, § 276's actual fraud provision, and § 278(2)'s language "without actual fraudulent intent." But *Ruderman* directly answers this. "[A]ctual fraud is not limited to . . . § 276," it also includes "constructively fraudulent [transfers that] fall, for example, within § 273." *Ruderman*, 355 F.2d at 998 (quotation marks omitted). We see no reason why *Ruderman* is not good law from the Second Circuit. The Dillon Trust Company does not address *Ruderman* on appeal, despite the Court of Federal Claims' reliance on it and the Government's citation to it in its responsive briefing to this court. As constructive fraudulent intent under § 273, and not just fraudulent intent under § 276, can qualify as actual fraud, then the fact that the transactions were collapsed and transferee liability assessed under § 273 does not entitle the Dillon trusts to use of the cap on liability in § 278(2).[11]

## III

We turn next to the Dillon Trust Company's contention that the Court of Federal Claims erred in holding the Dillon trusts liable for HSHC's tax penalty. The Dillon Trust Company argues that the Dillon trusts cannot be liable for the $10.2 million gross valuation misstatement tax penalty that HSHC incurred in the tax year after the stock sale because transfers under NYUFCA § 273 are only "fraudulent

---

[11]   The Dillon Trust Company does not challenge the Court of Federal Claims' decision under *Ruderman*, and its other arguments to this court are directed to the Court of Federal Claims' alternative findings if *Ruderman* did not apply, which we do not need to reach.

42                      DILLON TRUST COMPANY LLC v. US

as to creditors," not as to future creditors.  The Dillon Trust Company relies on the Eighth Circuit's decision in *Stanko v. Commissioner*, 209 F.3d 1082 (8th Cir. 2000), to support this contention.

The Court of Federal Claims determined that the amount HSHC owed, and whether that amount can be collected from a transferee, is subject to federal law under 26 U.S.C. § 6901.  *Post-Trial Order*, 168 Fed. Cl. at 262 (first citing *Tricarichi v. Comm'r*, 908 F.3d 588, 593 (9th Cir. 2018); then citing *Buckrey v. Comm'r*, T.C. Memo. 2017-138, 2017 WL 2964716, at \*19–20 (2017); and then citing *Kreps v. Comm'r*, 42 T.C. 660, 670 (1964), *aff'd*, 351 F.2d 1 (2d Cir. 1965)).  The Court of Federal Claims also determined that, if the assets received by the transferee exceed the total tax liability of the transferor—as they do here—then all the pre-notice interest and penalties owed by HSHC can be asserted against the transferee.  *Id.* (first citing *Tricarichi*, 908 F.3d at 591; and then further citation omitted).

As an initial matter, there appears to be a circuit split on how to consider whether a transferee is liable for tax penalties.  While the Dillon Trust Company relies on *Stanko*, the Court of Federal Claims cites to *Tricarichi*, a Ninth Circuit decision, as well as *Kreps*, a Tax Court decision that was affirmed by the Second Circuit.  And the Government cites additional case law holding that a creditor's rights against a fraudulent transferee extend to both the underlying claim and accruals on that claim, so long as the total amount of transferee liability does not exceed the value of the asset transferred.  Appellee's Br. 52–53 (first citing *Tricarichi*, 908 F.3d at 591–93; then citing *Shockley v. Comm'r*, 872 F.3d 1235, 1256 (11th Cir. 2017); then citing *Schussel v. Werfel*, 758 F.3d 82, 92–93 (1st Cir. 2014); and then citing *Kreps*, 42 T.C. at 670).

The Court of Federal Claims decision is thus supported by First, Ninth, and Eleventh Circuit precedent.  Additionally, its decision is supported by *Kreps*, which was affirmed

by the Second Circuit. *Kreps* held that "the transferee is retroactively liable for transferor's taxes in the year of transfer and prior years, and penalties (additions to tax) and interest in connection therewith, to the extent of the assets received from the transferor, even though the transferor's tax liability was unknown at the time of transfer." 42 T.C. at 670. The Ninth Circuit adopted this same view in *Tricarichi*:

> For over half a century, tax courts have generally held that whether federal or state law determines the right to and amount of pre-notice interest depends on whether the value of assets received by the transferee exceeds the total federal tax liability owed by the transferor, including statutory penalties and interest. *See, e.g., Estate of Stein v. Comm'r*, 37 T.C. 945, 961 (1962); *Lowy v. Comm'r*, 35 T.C. 393, 395–97 (1960); *see also* 14A *Mertens Law of Federal Income Taxation* § 53:41 (August 2018). Where, as here, a transferee has received assets worth *more* than the transferor's total federal tax liability, pre-notice interest is determined under the federal Internal Revenue Code and there is no need to consult state law regarding interest. *See Lowy*, 35 T.C. at 397. . . .

> The First Circuit recently followed the reasoning of *Lowy* and *Estate of Stein* to derive the "simple" rule that "[t]he IRS may recover from [the transferee] all amounts [the transferor] owes to the IRS (including section 6601 interest accruing on [the transferor's] tax debt), up to the limit of the amount transferred to [the transferee], with any recovery of prejudgment interest above the amount transferred to be determined in accord with [state] law." *Schussel v. Werfel*, 758 F.3d 82, 92–93 (1st Cir. 2014). In so holding, the First Circuit explained that "it is helpful to distinguish between

interest accrued on the tax obligation of the tax-payer-transferor, and interest accrued on the transferred funds recovered from the transferee by a creditor." *Id.* at 88–89. "Federal interest on a tax obligation accrues automatically . . . [and] is simply a part of the debt owed by the taxpayer-transferor to the IRS, *see* § 6601(e), all of which may usually be collected from a fraudulent transferee to the extent of the amount fraudulently transferred." *Id.* at 89 (citing *Lowy*, 35 T.C. at 394). As a result, there is no need to consult state law where the value of the transferred assets is *more* than the transferor's total tax liability. . . .

We agree with the First Circuit's reasoning in *Schussel* and the tax court's decision in *Lowy* . . . .

*Tricarichi*, 908 F.3d at 591–92 (alteration, emphases, and second omission in original) (footnote omitted); *see also Shockley*, 872 F.3d at 1256 (affirming transferee liability that included penalties and citing approvingly a Tax Court case that held "[a] transferee is liable retroactively for the transferor's taxes and additions to the tax in the year of the transferor to the extent of assets received from the transferor, even though the tax liability of the transferor was unknown at the time of the transfer." (citation omitted)).

*Kreps* in particular suggests to us that the Second Circuit would adopt the rule adopted by the First, Ninth, and Eleventh Circuits, and not follow *Stanko*. Based on the *Kreps* case, and multiple other circuits following the same principle, we see no error in the Court of Federal Claims' decision to include the penalties owed by HSHC in the Dillon trusts' transferee liability.

IV

Lastly, we turn to the Dillon Trust Company's contention that we should reverse the Court of Federal Claims' summary judgment order denying the refund of approximately $11 million in underpayment interest that accrued

after May 2015, when the Dillon Trust Company deposited approximately $71 million with the IRS pursuant to 26 U.S.C. § 6603. The Dillon Trust Company argues that the IRS abused its discretion by declining to apply certain of the successor trusts' deposits as payments of the tax liabilities of the original trusts, instead causing the continued accrual of interest after May 2015. We disagree.

Section 6603 is titled "Deposits made to suspend running of interest on potential underpayments, etc." and provides:

(a) Authority to make deposits other than as payment of tax[.] A taxpayer may make a cash deposit with the Secretary which may be used by the Secretary to pay any tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit. Such a deposit shall be made in such manner as the Secretary shall prescribe.

(b) No interest imposed[.] To the extent that such deposit is used by the Secretary to pay tax, for purposes of section 6601 (relating to interest on underpayments), the tax shall be treated as paid when the deposit is made.

(c) Return of deposit[.] Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing.

26 U.S.C. § 6603.

The Court of Federal Claims explained that the crux of the issue is "whether the IRS violated the law by exacting underpayment interest when it was forbidden from doing so. Without a finding of illegality on the part of the IRS, [the trusts] cannot succeed on the merits of their illegal

exaction claim." *Summary Judgment Order*, 162 Fed. Cl. at 717. After explaining the legal framework of § 6603, the Court of Federal Claims reasoned that "[c]ertain logical conclusions follow from the plain language of the[] statutory provisions": (1) "a deposit is *not* a tax payment until and unless the IRS uses the deposit for a payment"; (2) "if the IRS does not use any portion of a deposit to pay tax, no interest-suspension benefit is triggered"; and (3) "§ 6603 does not require the use of deposits as tax payments . . . [, and, w]hereas other subsections of § 6603 mandate a certain outcome through the use of 'shall,' § 6603(a) is pointedly permissive." *Id.* at 718. Accordingly, the Court of Federal Claims determined that "[t]he decision to use a deposit for a payment of tax is thus subject to IRS discretion, and the statute does not limit such discretion with conditions or exceptions." *Id.*

We review both the Court of Federal Claims' decisions on summary judgment and its legal conclusions de novo, and we reach the same conclusion as the trial court. The plain language of § 6603(a) explicitly grants the IRS discretion in choosing whether to apply a deposit as a payment against a taxpayer's liability: "A taxpayer may make a cash deposit with the Secretary which *may be used by the Secretary* to pay any tax imposed . . . ." 26 U.S.C. § 6603(a) (emphasis added). Thus, although the Dillon trusts had a statutory right to *request* that their deposits be used to pay the later assessed tax liability, they had no statutory *entitlement* to that request being honored.

On appeal, the Dillon Trust Company contends the IRS abused its discretion in not applying the deposits to pay the original trusts' liability because this thwarted the purpose of the statute. The Dillon Trust Company argues that "the purpose of § 6603 is to 'provide an effective way for taxpayers to manage their exposure to underpayment interest' by giving them the option of making a deposit that will prevent the accrual of interest." Appellant's Br. 48–49 (quoting H.R. Rep. No. 108-548, pt. 1, at 305 (2004)). That is of

DILLON TRUST COMPANY LLC v. US 47

course true, but it does not control the outcome here. In the statutory text, Congress did not make the application of a deposit to tax liability discretionary only on the part of the taxpayer. Rather, it used double permissive language: "[a] taxpayer *may* make a cash deposit with the Secretary which *may* be used by the Secretary." 26 U.S.C. § 6603(a) (emphases added). Congress did not use the word "shall" or any other mandatory language in § 6603(a) requiring the IRS to apply any deposit made to a tax liability. We presume Congress means what it says. *See Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc.*, 108 F.4th 1376, 1382 (Fed. Cir. 2024) ("We assume Congress means what it says and says what it means."). Here, Congress granted the IRS discretion without statutory limits to decide when to use a deposit made pursuant to § 6603 as a payment. *See Summary Judgment Order*, 162 Fed. Cl. at 718 ("The IRS did not . . . violate a provision of law that mandated the use of plaintiffs' deposits for tax payments.").

In this case, moreover, the IRS contemporaneously provided the Dillon Trust Company with an explanation for declining to use the deposits made by the successor trusts as payments of the taxes owed by the original trusts. In a 2017 Memorandum provided to the Dillon Trust Company in response to a request for assistance, the IRS explained that the successor trusts were legally distinct entities from the original trusts, and in such a situation the two sets of trusts might not have identical rights and obligations. *See* 2017 IRS Non-Docketed SAR LEXIS 2, IRS NSAR 20171801F, at *4–5 (Feb. 27, 2017) ("*Memorandum*") ("The liability of a transferee is derivative of the transferor's liability. Yet while multiple transferees may be severally liable for the same liability of a transferor, it does not follow that the liability of the several transferees is the same liability. . . . [I]t does not necessarily follow that the liability of one transferee is interchangeable with the liability of another."); *see also Summary Judgment Order*, 162 Fed. Cl. at 718 ("[T]he IRS explained to Dillon Trust Company that it could only use the deposits as tax

payments when the taxpayer who owes the liability made the deposit.").  Even "[m]ore concerning," according to the IRS, was that "the guidance issued to date to administer" § 6603—Rev. Proc. 2005-18, 2005 WL 580680 (Mar. 28, 2005)—"*does not authorize* one depositor designating its deposit to be applied to another taxpayer's liability." *Memorandum* at *5 (emphasis added).  In the absence of any statutory, regulatory, or other guidance as to how the IRS should exercise its discretion to respond to a request to use one taxpayer's deposit as a payment for another taxpayer, we cannot say it was an abuse of discretion for the IRS to deny the Dillon Trust Company's request here.  Instead, we agree with the Court of Federal Claims that "the agency's decision was based on a reasonable interpretation of Rev. Proc. 2005-18, as offered in the [*Memorandum*]."[12]  *Dillon Tr. Co. LLC v. United States*, 164 Fed. Cl. 92, 96 (2023) ("*Reconsideration Order*").

The Dillon Trust Company emphasizes that "while the IRS refused to apply the [s]uccessor [t]rusts' *deposits* against the [o]riginal [t]rusts' liabilities, it readily accepted their *payments* of the [o]riginal [t]rusts' liabilities." Appellant's Br. 47; *see also* Appellant's Br. 54 ("It is patently unfair and irrational for the agency to demand that the [s]uccessor [t]rusts *pay* the liabilities, with interest, of the [o]riginal [t]rusts while denying them the opportunity to stop the running of interest as Congress intended.").  The situation, however, is more complicated than the Dillon Trust Company contends upon close inspection.  At the time the deposits were made, the IRS had not yet assessed

---

[12]   Contrary to the Government's assertion in its brief, we do not see any evidence that the IRS has adopted a "bright-line rule" that requires it to *always* reject a taxpayer's request to use a deposit as a payment for another taxpayer's liability. Appellee's Br. 67.  Our decision today is thus based on the IRS's fact-specific exercise of discretion.

DILLON TRUST COMPANY LLC v. US                    49

any tax liability against the successor trusts. "[I]t was not until October 2018 that the IRS issued notices of liability to the [s]uccessor [t]rusts." *Reconsideration Order*, 164 Fed. Cl. at 93. Thus, at the time the IRS applied the money received from the successor trusts as payments (the same money that had initially been deposited, then returned, and finally resubmitted as payments) *the successor trusts themselves had tax liabilities* (albeit arising by virtue of being successors to the original trusts). As unfortunate as this series of events may have been for the Dillon trusts, the Dillon Trust Company has not shown that it was *unlawful*, the necessary predicate for an illegal exaction claim. To the extent the Dillon Trust Company criticizes the timing of the IRS's issuance of the notices of liability, it did not bring a claim challenging it. Nor would the Court of Federal Claims have had jurisdiction over such a claim. As such, that issue is not before us today. *See Summary Judgment Order*, 162 Fed. Cl. at 719 ("If anything, plaintiffs' argument effectively morphs into a claim for the abatement of interest [under 26 U.S.C. § 6404(e)] attributable to unreasonable errors and delays by the IRS, a claim over which this court lacks subject matter jurisdiction.").

None of this is to say that we are unsympathetic to the Dillon trusts' plight. To be sure, taxpayers would benefit from the IRS developing further guidance on § 6603 and how to prevent the accrual of underpayment interest. But our holding is compelled by the latitude Congress granted the IRS in deciding whether to apply a deposit as a payment of a tax liability. With no existing rubric, either in the statute or elsewhere, against which to measure that discretion, we are not prepared to hold that the IRS's

exercise of its discretion was abusive.  We will not second-guess the IRS's judgment on this matter.[13]

CONCLUSION

We have considered the Dillon Trust Company's remaining arguments and find them unpersuasive.  For the foregoing reasons, we affirm the decisions of the Court of Federal Claims.

**AFFIRMED**

---

[13]   Our holding should not be misconstrued as endorsing the view—which the government suggested in the trial court, though not on appeal—that the IRS's exercise of discretion under § 6603 is judicially unreviewable.  *See Summary Judgment Order*, 162 Fed. Cl.  at 719  n.8 ("We therefore need not consider whether the IRS's decision is even judicially reviewable.").